You know, we've read the briefs and re-read the briefs and, you know, as a panel, we concluded that there was some lack of clarity in terms of some of the procedural nuances in this case, not so much the big ticket issues, you know, at the forefront, satellite litigation seemingly, over this issue of the concession, what was conceded, what wasn't, and all that. And that was the basis of our requesting the supplemental letters to help clarify, so by the time we got here, we had a better grip on that, not to usurp your argument about it, arguing here, but just so we had a sense of what the positions were on that. Now, as a result of it, one of you filed a motion to strike the other one's parties as non-responsive and all that, so it was never our intent to create more work for us over getting clarification. And then I also think you understand now something is in front of us in terms of the contempt order that was down below. So, my short point is that, you know, we've got all that stuff, basically they're carried with the case, you know, to deal with it, we haven't discussed all that, that's all new news. So, it is to say, oral argument is designed to help the panel understand the case, and so this should not, hopefully won't be an exercise of expanding all these other issues that seem to be there, contentiousness and so forth, but we really do want to understand the procedural part so you can help us, I'm not saying you've got to start that, but just help us with understanding what's not at issue on appeal, so that we clearly can deal with what is at issue on appeal. So that's a major thing, just giving us, from your respective point of view, just clarity about your positions, what happened, what didn't happen, and somewhere along the line you can address the motions and all that stuff, just so by the time we leave the bench, we're clear on all the positions, so, is that helpful? Yes, Your Honor. Alright, with that, you're on. Thank you, Your Honor. May it please the Court, Steve Fleckman for MexiCorps. The first thing I would like to do is address one housekeeping matter. We have it handed to the Court today, we tried to have it delivered yesterday, but Federal Express didn't make it, our oral argument exhibits. There is one Exhibit 6 that is objected to on the grounds that the photograph itself was not in the record, it is a comparison of the non-logo flag bag with the purple bag, that one. I will not refer to that specific photograph. There is... Maybe if you would have bought us a bottle of each one full, that would have taken care of the problem. We did bring one. The other thing that is objected to is something that is in the record below, but not necessarily in the record on appeal. We will ask that judicial notice be taken of the Summary Judgment Motion that is mentioned in our exhibits, and that Summary Judgment Motion just has a single quote at the top of tab 10 in the oral argument exhibits, and it's a quote that we can regard as a concession in the nature of a judicial admission. It appears in Diageo's Summary Judgment Motion below, it's an excerpt, and we leave to the Court whether it chooses to take judicial notice of proceedings below in that respect. With regard to the procedural posture of the case, I will address briefly the contempt motion. No order has been issued on it yet. I will address it for the following limited purpose. To illustrate why we contend the third paragraph of the injunction granted below in 2015 is hopelessly and inappropriately vague, and violates the principle that an injunction should be narrowly drawn and precisely drawn to give notice so that contempt cannot be assigned to vague language. The Court below has received briefing on it. We've asked that you take judicial notice of the briefing because we believe it reflects on the issues that you have to decide. I'll now move to the issue of the procedural posture of the case. The procedural posture of the case is that we believe that in the pleadings of both parties, two substantive issues before you were pled. The complaint clearly pled that there was a contest as to the word marks that MexiCorps was using, all of what we call the State Crown Club word marks. We reciprocally pled in our counterclaim that those word marks were valid and that a declaration should issue declaring them valid. At the close of the evidence, at the close of the evidence as part of a strategic maneuver designed and successfully designed to essentially avoid and defeat MexiCorps' lachis defense, Diageo suddenly stipulated by judicial admission that there was no infringement of any nature by MexiCorps prior to the last quarter of 2011. MexiCorps had been using its Texas Crown Club word mark by that time, I'm talking about before the last quarter of 2011, had been using it since 2008 at least. What about as to the other states? As to the other states, they came on later. They came on later. They were introduced later. And our position is clear on this. Our contention is that if Texas Crown Club as a word mark, I'm not talking about as a design, if Texas Crown Club as a word mark, which appears on the back of that bottle label, and we put a copy of that bottle label in our oral excerpts, if it is non-infringing as Diageo stipulated by judicial admission, then they are similarly stopped from claiming that any of the other word marks as to which we were asking for a declaration and which they pleaded for in their complaint, I should say pleaded against in their complaint, those two must be regarded as non-infringing for a simple reason. They do not claim any rights in any geographic descriptor. The substitution of Colorado, Arkansas, South Carolina, or the word Southern for Texas should not make a difference in terms of the validity of those word marks. Now four of the word marks have been registered with the Patent and Trademark Office, and those are in the record, and we have record excerpts that we have provided to the court. Those four registrations are of standard word marks. They are presumptive of the right, the exclusive right of MexiCorps to use each of those marks in commerce. They are presumptive of their validity as against any previously registered mark, including all the Crown Royal marks, and they are presumptively valid as against any contention that they either infringe for likelihood of confusion or likelihood of dilution. Beyond that, there was absolutely no evidence whatsoever presented by the party who had the burden of proof on the standard word marks, not a single shred of proof presented at trial. Counsel, let me ask you a procedural question. Yes, Your Honor. You raised this with the district judge after the evidence had been presented at Jury Charge Conference. You asked for JMOLs on a variety of things. At some stage, the judge shifts to tell me what's conceded or not, and you go through your motions, if I understand what's in the transcript, and finally, when all that's finished with, the judge denies all of those for the motions, or whatever the number is. So it seems to me that means they go to the jury. There were no jury instructions on the counterclaim where there was a response from the jury as to what to do with your counterclaims. You file a Rule 50 motion after the jury verdict, but they were not presented to the jury. There's no way to set aside, it seems to me, a jury verdict on something not presented. So my first question is, how were these presented to the jury, other than the obverse or reverse, I'm not sure what the difference is, of the claims? Wouldn't you have needed to have presented to the jury, give us answers on these counterclaims? Does Southern Crown and Friends, do any of these other things constitute a violation? So I hope I've been clear enough. Where are we procedurally on my question? You've been absolutely clear. Whether I have or not, that was a good thing for you to say. And it is equally clear from the Fifth Circuit's ruling in layered against air carrier engine services in 1959. And what they said is the following, attorney's statements speak for the client and dispense with proof of facts. They are not merely evidence, they are absolutely binding. They foreclose the matter altogether. If you look at my 50A motion, what I was saying to the court is, as a matter of law, based upon the posture of the case at that point, there is no jury issue to decide on the facts as to the trademarks. Well, but backing up from that, it still seems to me, I mean, you're just saying now you were rolling the dice, I guess. Until that concession that is tied to laches, you would have been presenting this to the jury, your counterclaims? Absolutely. So, had you already pre-trial, in some long pre-trial order, which I haven't looked at, gave jury instruction, proposed jury instructions of those, or otherwise teed those up, and then withdrew them at the jury conference? Here's what I recall of the situation. What I recall of the situation is that I had cross-examined the vice president for Crown and Royal aggressively on the issue of the word marks. She admitted the following. They had no exclusive right to the word Crown. It was only the addition of the word Royal that made Crown meaningful. They had no right to a geographic descriptor in the word mark. They had no objection to the bottle label based on infringement. And none of the activities prior to the last quarter, she testified prior to 2012, none of MexCorp's activities prior to 2012 had been infringing, and that was the very period that MexCorp was marketing extensively its word marks on radio, on billboards, at conventions, and on merchandise. So to answer your question, I can't tell you that I went into that jury charge conference believing that I had any responsibility whatsoever to make a submission on that to the jury. I also will tell you candidly that I felt that if the trademarks were going to be an issue at all, the burden of proof was on Diageo to make that submission to the jury, not on us. That does go to the question that had been posed in the letter to us recently, which is, were we taking the position that we were entitled to a declaration or simply to a dismissal with prejudice? I might say to you that as long as it's clarified so that we don't have these continued disputes with Diageo at the PTO and elsewhere, I'm not certain that it matters. But the judgment should clarify, either by declaration or by some other specific language, that the word marks, the standard word marks, have not infringed. Why don't you move beyond the procedural point I raised? We don't have much time and much to cover. Absolutely. I'd like to move then, if I might, to the scope of the injunction and the safe distance concept which has been brought up. I will note that the trial court, in its injunction order on September 30, 2015, noted that Diageo's counsel had summed up the case by stating that the only issue in the case is crown on a bag. I put into our oral argument excerpts all of the judicial admissions that are binding on Diageo and should stop it from denying its position at trial, on which it succeeded in getting a favorable verdict and defeating the laches defense, that the only relief they wanted, the only relief they cared about, and the only relief they needed was to remove crown from being on the bag. Our client did that immediately upon issuance of the verdict. By December 2014, our client had switched over to the use of a red, white, and blue bandana, not a bag, not a receptacle, not a container, not an enclosure. That bandana is a cowboy bandana that is worn around the neck of the bottle like it would be worn around the neck of a cowboy. It identifies with the culture and the spirit of Texas, and that is the marketing message of MexCorp to this day. We think that the injunction is overbroad because, and I'm just going to go right to paragraph three, it's overbroad and defective because that vague language is now being used as a pretext to challenge that bandana and to challenge an entirely different brand identity that MexCorp switched over to even before trial to try to avoid disputes with Diageo, which was its Select Club brand. It markets all of the other state whiskeys under the brand Select Club with no reference on the bag whatsoever to crown and no reference on the bottles whatsoever to crown. And both of those product trade dresses, the bandana and Select Club, are now being cited under prong three and the other two prongs, the previous two prongs, as being contemptuous of the district court's injunction. Remind me, did you, I'm sorry, go ahead. Did you object, not that it would have been required after Judge Hittner issued this, and did he issue a, after he issued this injunction, Mr. Timothy, did you point out what you're talking about and Judge Hittner stayed with this? Was this raised with him? Well, actually I did, but it happened in a different sequence. His response, though, whatever the sequence was. Well, the language he adopted was almost verbatim what was proposed, so we had an adequate opportunity to brief and we extensively briefed by response and then sir reply their motion for injunction. So we raised our issue. This was already on the table in that briefing that you were talking about, this language. The kind of language that he adopted. The language he adopted. The only change he made, Your Honor, was to change alcoholic beverages to whiskey. That was the only change he made. Now I'm going to speak briefly to the two prongs that precede the third paragraph. Well, before you go there, because you're out of time, but just hold what you got, but I was going to ask a question similar to what Judge Southwick asked you, but his was better than the way I was going to ask it, but I had a similar concern of whether or not the way this was teed up to us about the scope of this injunction was fairly, if you will, teed up before the district judge, either in some kind of post-trial motion or provoking a hearing, something more dramatic than just papers flying, because I've already kind of gotten the feel for this case in terms of just all this paper flying, but you're saying to us you're confident that that did happen and the only change the judge made was about the alcoholic beverage. That's the only change he made. But the arguments you're making to us about the red bandana and the effect of the language, et cetera, et cetera, et cetera, in the papers or otherwise, that was straight on presented to Judge Hidner in post-trial, whatever, proceedings, motions, et cetera. I may have misstated. The red, white, and blue bandana had not become an issue because Diageo made no issue of it before the injunction, even though they knew about the bandana, they made absolutely no objection to it before the injunction issued. So they didn't change their proposed language. There was no reason for me to raise the bandana, therefore. I address the fact that I felt and I do feel that the injunction language is inconsistent with Rule 65D's specificity requirement. And I addressed in our briefing our position that the third paragraph of the injunction was so hopelessly vague that it will perpetuate disputes and that's exactly what it's done. All right, well, I will just say, as of this moment, you can color me very skeptical that this issue as framed to the Court of Appeal was framed in all its panorama to the district court. I'm not saying that as a criticism. I'm just saying, just based on where we are in red, that I'm very skeptical that this was framed in all its potential to the district court, but it to fairly appreciate or whatever the back and forth on this scope of injunction matter just because of the way that's here. So the question that comes from that is, we're not ordinarily in the business of writing injunctions in the first place. So even assuming you would be to be persuasive on this, most of what would happen would be a remand to the district court to look anew at the scope of the injunction. I'm just saying we're not going to, in a plenary capacity, rewrite an injunction and you're very experienced in this domain, you know that. So I'm not saying we're there. I'm just saying, A, I'm skeptical whether or not it fully was fleshed out because there's so much going on in this case anyway, that Judge Hittner had a full, you know, frontal view of exactly what was being contended to really deal with it. So we then have an order from him where he's fully taken into account, denied it, granted it, et cetera, and in an ordinary course, the way we get things, you know, then we're dealing with, well, this is right, this is wrong, and that's, again, not mentioned as a remand, but just the way this case is, I'm just real skeptical that that didn't happen. So I don't know if the relief . . . I want to be clear that you're clear that the relief you're asking for, if granted, would probably be a remand back to the district court, and you all would be back there now fighting over this other stuff, including the sanctions and the rest of that stuff. I don't know how well Judge Hittner will welcome you, but in any event. Having said that, Madam Clerk, give Mr. Fleck two minutes, because you're out of time otherwise, but we have questions. So give him two minutes, and you've got two minutes to address whatever else, you know, you got left, and if you need it on the other side, you know, an equal opportunity, I'll add the two, so don't worry. But the whole point of this is so we get it right. So go for it. Absolutely. I'd like to address briefly what you've just pointed out. All right. I'd like to divide it, if I might, into two time frames. We never in our wildest dreams imagined that we would be here today on a contempt motion that was filed in apparent response to the announcement of our opportunity for oral argument here, because that motion attacks a bandana which had never been challenged, even though it, before his injunction language was accepted. We never dreamed that the Select Club language would be challenged on this injunction, because Select Club, no one has suggested that Select Club violates, infringes any rights, and in fact, the council had stipulated in response to our attempt to amend our complaint to vindicate Select Club as a new brand, as a precaution, that Diageo was not, had not challenged Select Club. So we never dreamed we'd be at this point. However, backing up in time, what we have said about paragraphs one and two of that injunction are the following, that they are inconsistent with the judicial admissions and the judicial estoppel that follows, based upon the stipulation by Diageo that the only concern they needed to have addressed was to remove Crown from the bag. That was what they had said when they succeeded in getting their favorable jury verdict. It's what they told the court as well. So that was their position. We think that the injunction should have held them to their position. What happened, and then I'll stop, what happened is that instead, the trial judge did not even consider the effect of the judicial admissions or judicial estoppel, and put together, accepted an injunction which has language which would prohibit the very bottle and non-infringing flag bag from being sold together, which Diageo had just admitted during the proceeding was absolutely valid and non-problematic, and did not in any way pose a threat to them or their product. And that contravenes a strong public policy in favor of competition. This is not a gray zone. It's not a safe distance issue. They articulated and delineated the relief they needed. And then they proposed language which would prohibit the very trade dress that they had just pronounced non-infringing. Thank you, Your Honor. All right, well you've preserved rebuttal time for when you come back up on the issues. All right, we'll hear from Mr. O'Rourke. May it please the court. My name's Brendan O'Rourke, I represent Diageo, the plaintiff and appellee. I'm going to leave my argument and go to some of the questions. Judge Southwick, you had asked about what happened at the jury conference. We had an all-day jury conference, it's in the record, and I just want to read to you the first three jury instructions that the parties agreed to. Number five, Diageo asserts claims against MexCorp for trademark infringement, unfair competition, trade dress infringement, and trademark dilution. So there was no abandonment of the trademark claims. We won on the trademark claims in the context of the trade dress claims. And what hangs over that whole thing, when you practice in this area, when you get to court and when you get before a jury or a judge, what they can determine is not some hypothetical world in the trademark office. They have to deal with what's actually going on in the marketplace. And what was actually going on in the marketplace was that every single product that MexCorp was selling in the marketplace, which is what the jury needed to decide, every single one of those products had a bottle that said some state or some geographic region, then a big word crown, and then a little word club, which then was put in a bag that also said geographic region. Be it Texas, South Carolina, whatever. Then in big letters it said crown, and then in little letters it said club. So that was the factual presentation to the judge and the jury. And of course, on those facts, even though we had trademark claims, we had trade dress claims, we had unfair competition claims, and we had dilution claims. What the jury decided was what they were doing in the marketplace was causing confusion. There was no free pass that if you just take the bottle out of the bag, then it's no problem. There was one concession by Diageo in this case, and that concession was there was an early version of the Texas Crown Club bottle that did not come in a bag. And the vice president in charge of whiskey for Diageo made a candid concession. She conceded it at her deposition. So it's not like this was this last minute, you know, Hail Mary by Diageo. She had conceded in discovery, and she conceded at trial, candidly, that at the time they saw that, and they didn't take action, and that she personally thought it was an infringement, but that the company took the position that it didn't. That's all that included, and maybe you just said that. I thought you were distinguishing it. I thought it had a Texas flag bag without any lettering. They're very clever the way they describe that, Your Honor. And you caught them in their cleverness. I want to get to that. They have bootstrapped a couple of arguments here. One of them they say is that Diageo admitted that the flag bag was non-infringing when it didn't have a logo on it. It was always Diageo's position that if you use crown and a product that says crown for whiskey goes in a cloth drawstring bag, that that's an infringement. Whether it has a word on it or not. So it said crown on the bottle, but the bag covers up the crown. That was still a problem. Yes, and let me just tell you what the record in this case shows. For starters, there was no evidence that that bag ever even existed. The flag bag that they tried to put into evidence by putting it into the Fifth Circuit last night at 5 o'clock, it's not in the record below. There is no bag without crown on it. You're talking about this Exhibit 6? Exhibit 6, which they've now withdrawn because I pointed out to them. It was never brought to the trial. The jury never saw it. It's not in the record. Maybe they're just being clever, but my understanding is that you conceded that MexiCorps did not infringe its marks until MexiCorps sold its very first Texas crown in a bag bearing the Texas Crown Club logo. That's true. Undisputed, MexiCorps alleged infringement began at the earliest on a certain date when it did that, and that previous uses were not infringing. Now, in your brief, you state that the use with the Texas flag bag without any lettering was so insignificant in numbers that we weren't concerned about it. Response to that was that that's not how infringement works. So I don't know about that, but I thought it was given that they were selling their alcohol in a Texas flag bag without any lettering. That's not exactly true, Your Honor. I'll tell you, because I know the record better than anybody. Better than I do. Their president said he was trying to source bags. They had always wanted to put these products in bags, but the bags were, the ones that they said they could get, they were very expensive because they had to be hand-sewn. They were only, they could only get like 100 of the bags at a time. They weren't selling that product in bags until, Your Honor, until the end of 2011.  It's clearly in the record. They then, in 2012 and 2013, they had line extensions for the other jurisdictions, and they changed the appearance of the mark on those bags to make it look even more like Crown Royal, so that those bags, those early bags, it was basically a test market that Diageo wasn't even aware of, and I would submit, Diageo had no responsibility to know that secretly they're test marketing a couple of hundred bags here, when they then, in 2011, at the end of 2011, and moving into 2012 and 2013, they're now flooding the market with products where every single product had Texas Crown Club or South Carolina Crown Club on the bottle and the bag. To make it worse, they changed the crown appearance on the bag to go from a fairly ordinary version of it on the Texas bottle. There were two significant differences, and at page 26 of their brief, when they told this panel that the new line extensions were virtually identical to Texas, and that's why they bootstrapped this judicial estoppel argument, they say, if you agree that the Texas bottle only, without bags, didn't infringe, then these other ones also don't infringe. But two significant things, one, the word crown now magically appeared in the color gold, which is the color that my client's mark appears, and the second thing they did is they no longer put it in common words, like the way your names appear here, they took the common font and they changed it to what is called a cursive font that's virtually identical to the way crown royal appears on my client's products. Let me ask you about the jury charge and the judicial estoppel, jury charge conference and judicial estoppel. The basic argument here is that this did not need and should indeed shouldn't have gone to the jury, and it's a procedural question. If, in fact, there wasn't, I have no doubt, you feel in your mind, but if we were to err and say that there was indeed a concession at this prior to or and that was discussed at jury charge conference, is it proper for us to determine whether if you slide in another state's name or if you put a region like southern instead of a state, that that would be covered by the same analysis as Texas crown so long as it was in the same kind of bottles with all these, without all these changes that you're talking about? Is that, would you agree that it's correct that that's not something that there was any error in failing to submit to the jury when the judge denied their motions pre-trial, pre-jury instructions and then denied their post-trial motion, post-verdict motion? Well, first of all, if the panel did that today or whenever you decide the case, you'd be making history, point one. Point two. History in what way? Now, what is it about what I just said? No court. I'm sorry to interrupt, Your Honor. Well, no, I think you know where I'm headed, so I just want you to elaborate. What is it about, I mean, first, I mean, judicial estoppel, if you're estopped, you're estopped, but if the judge says that you're not estopped, and here we are at jury charge conference, and you have a counterclaim. If you want to give it to the jury, give it to the jury, and they don't. That was a big part of the reasons for those pre-argument questions to you, just where are we on these JMOLs? So get back to your answer. They never did that, but I'm going to go back to the first point I made, Your Honor. In trademark law and in unfair competition law, all a trier of fact can determine is the facts that actually replicate marketplace reality. It is black letter, trademark, and unfair competition law. You're not allowed to say, oh, what I'm doing in the marketplace has been determined by the jury to be infringement and dilution. So you know what I'm going to do? How about, what if I change the way my product appears in the marketplace, Judge Hittner? They've already conceded that that bottle over there is not a problem. If I change what I'm doing in the marketplace, will you countenance that for me? And that's what they're actually asking the Fifth Circuit to do, which is, I've never heard of it. I've never heard of it. They are stuck with what they did in the marketplace, and we presented what they did to the marketplace to the jury, and the jury concluded that what they were doing was infringing, was diluting, and constituted unfair competition. And the jury was correct, which is why they are not appealing that part of the verdict. The jury instructions, Your Honors, also included definitions not just of trade dress. I read to you Instruction 5, talks about what the claims were. In Instruction 6, and these were agreed to, instructions. In fact, we negotiated them, and I've known Mr. Raymond forever. We do this for a living, and we were able to come up with these jury instructions, and Judge Hittner did a great job of saying, come on, if you can agree on them, then there's not going to be an issue. We don't have to come back down here. We agreed on these, and Instruction Number 6 talked about trademarks and trade dress, and it defined both of them. But then again, at the end of the day, what the jury had to decide was, what's happening in the marketplace? Is that causing confusion? And they actually even agreed, this is a stipulated jury instruction on the issue of likelihood of confusion, and the question put to the jury was, one question for your deter... And this is at the record SRE 2, which is at the appeal record of 4289 and 90. Number 7, likelihood of confusion. One question for your determination is whether the trade dress of MECSCOR's products is likely to cause confusion among ordinary consumer as to the source, sponsorship, approval, or affiliation of MECSCOR's goods. In other words, you must decide whether ordinary consumers under usual conditions, exercising ordinary care, would be likely to believe that MECSCOR's products are affiliated with the IGEO's Crown Royal products. That's black letter trademark law. Mr. Raymond knew it, I knew it, we agreed to that, and that's what the jury decided. So I wanna back up and make sure I cover a couple of things. Well, what benefit did it, I mean, to me, if you had a, normally stipulations and concessions are designed to streamline and otherwise make simple the process. It just seems like this concession had the opposite effect of, you know, even I heard what you said, VP conceded in the deposition, but it seemed like this concession, I mean, you know, they didn't prove it, I mean, you just put it all out there. If they didn't prove it, you know, obviously there's a fine, but it seemed like this concession triggered a whole satellite, you know, it's like no good deed goes unpunished, so to speak. Maybe I shouldn't put it that way, but it just seemed this concession in the middle of otherwise, you know, star lawyers who do this for a living, I mean, you all operate in this world, you know, all the time, you're good at what you do, trying it, you get a jury trial. Is it in the summary judgment? It's a jury trial. You tee it up, you've got jury charge, I have no doubt you have some sterling pre-trial order from Judge Hittner, who's been around a long time, really good trial judge, but then all of a sudden, that is jury trial aside and the issues, we're trying to figure out procedurally what in the world you world-class lawyers did, you know, down below, you get my point? I do, I do, I think I have a good answer for you too. Go for it. So my client was under an obligation to tell the truth, okay, and I take that very seriously, so does Diageo. And the truth of the matter was, when they saw for the first time that every single one of their products came in a bag that said Crown, it was game-changing, okay? They never saw the- With Crown still not on the outside, you're just talking- No, no, no, they never, my client never saw that bag, and that bag never was part of the trial other than a little bit of testimony by Mr. Morales, who was their president, who said, we tried to get that bag going and we couldn't, it was too expensive and it was a fleeting use that created no obligation on my client. What my client did become aware of at the end of 2011 was the Texas Crown Club, which was only in a bottle, which they said, I don't think we can stop that. They then said, oh, we're gonna put it in bags that also say Crown, and then we're gonna line extend this thing into all these other jurisdictions, and they're not only gonna say Crown on the product and the bag, we're gonna change the Crown portion of the mark to make it look really a lot like Crown Royal, and my client threw a fit, understandably. So that's when the lightning rod hit. So to back up to your question, Judge Stewart, is number one, Diageo was under an obligation to tell the truth. Number two, Diageo did not know about the bag that didn't have Crown on it in Texas, and they will not be able to point to any evidence in this case that shows my client knew about that bag. So it couldn't have conceded that it was non-infringing because it didn't even know about it. And number three, again, go back to what happens when the jury looks at a set of facts. They found that those marks on these other bags were infringing in the context of their use. They found that there was a likelihood of confusion after the court, based on jury instructions that were stipulated to, defined trademarks, trade dress, likelihood of confusion, and they found that what their client was doing was causing a likelihood of confusion. So what do you have no problem with and agree to, and what do you have a problem with? One thing and only one thing that we agree to. We agree that we passed on Texas Crown Club when it came out in 2008 in its original label, which is different than the label that they have now because it gets tricky, but the new label has a little line in between crown and club, which, in our view, separates the mark that makes crown stand out even more. There's an original label that just says Texas Crown Club on a bottle label without a bag, and we concede that that, for purposes of, everyone in this case can assume that that is a non-infringing use. What they tried to do is- And you conceded that because latches would have gotten you anywhere. That's not true, Your Honor. We conceded it because it was the truth. Our client knew about it and took no action and actually made the corporate decision that while they were bothered by it, they wanted to let the marketplace work itself out. But what they were doing is they were dipping their toe in the water, and we only learned that later. They dipped their toe in the water, and every time they did something to design their new products, they kept getting closer and closer and closer to my client's product. And the law is also clear that you don't have to sue someone when they sell 10 bottles or 100 bottles. This was a progressive encroachment, and my client acted diligently once their true intent was known. And so what they wanna do now is, without ever putting these questions to the jury, namely, if I only did these in bottles and I didn't throw a bag on them, is that non-infringing? They never put that question to the jury, even though they had a counterclaim that said that. I would have argued at the time that that's not a proper question based on the facts of the case because of the- Let me ask, I mean, it goes back to what you were saying earlier, that these potential alternative ways that they might enter the marketplace would not be appropriate in this kind of, in a trial. Had any of this been raised with you? I didn't hear that last part. Well, you were saying earlier that the possible ways in which marketing might occur that have not yet occurred in the marketplace or not properly before a jury in a case such as this. Their counterclaims, you're telling me, were all based on, not all of them, but the four we're talking about, based on entries into the marketplace they had not yet done, not yet marketed. At least some of these, maybe some of them not. Had Judge Hittner had any of this raised with him yet on what a jury instruction on a counterclaim would look like? And he said something, you made this kind of argument to him. Has any of that ever gotten to him? I don't remember that, Your Honor, to be perfectly honest. I believe what happened was they tried to bootstrap the limited admission by Diageo, and they tried to bootstrap that into a license and an advisory opinion from the court in the form of a motion for judgment as a matter of law. And then they did it again in their Rule 59e motion that the other products in the other jurisdictions, if they then didn't have stylized marks, if they just had plain marks, just on a bottle, they too would be okay. It never got to the jury, and it was their obligation to get that to the jury. Could you turn to the injunction now and whether it's overbroad? Obviously our position is it's plainly not overbroad. Even the third paragraph of it? The third paragraph is, Your Honor, there's a lot of cases, and it's in our brief, that this language, when a judge sees what happens, and Judge Hittner, as Judge Stewart pointed out, is a very experienced trial judge. It was a blast being before him. I think everybody had a great time. He's kind of a character, but we love him. We love him too. He has the discretion, and the standard of review when you look at that injunction is abusive discretion. He had the discretion based on the findings that there was confusion in the marketplace, and by the way, he also listened to, I've been doing this a long time, I've never seen evidence of actual confusion the way we were able to demonstrate in this case, and that's in our brief as well. But he has the discretion to say, what do I need to do to protect Diageo in the form of a permanent injunction because the Lanham Act provides for a permanent injunction. First of all, it's customary, when you win a trademark case, you get an injunction. Sometimes if you do it early enough, you get a preliminary injunction. If you wait till the end of the trial, you get a permanent injunction. But in the third paragraph, this is customary commonplace language that has been approved by many, many courts in this circuit. I would refer you to our brief on that topic where in addition to what the two specific things were that they were being enjoined from, they're also enjoined from putting out more products that are confusingly similar to the Crown Royal trade dress, and they know exactly what that means. All right, counsel. Did you give him, when you started, had you given him the two minutes I gave to the other side? Okay, I didn't think so. So you got two. Unless there's more questions, I think I'm finished. We always got questions. This case has presented more questions than Carter got liver pills. So then I'll take the time then to ask you more. Okay, let's get to these ancillary things that we've had provided to us. The motions that we carried with the case and then the matter that Mr. Fleckman spoke to about the contempt. I'm not sure how that all fares, so just wanna hear, we just wanna, I mean, what's your take on that? I'll start with contempt, Judge Stewart. I'm not sure why we're talking about it. It really shouldn't be before the Supreme Court. But since it is, we made a motion for contempt because, again, dipping their toe in the water, walking their product up as close as they can to Crown Royal at every turn. What they did now is very clever. They have two products in Texas. They have one called Texas Crown Club, and instead of putting it in a bag, they put it in a bandana that looks just like a bag, point one. And point two, they have a second product, Select Club, which doesn't say Crown, and they put those in bags. And guess where those are now on shelves, in stores throughout the state of Texas. There's a giant Texas Crown Club display with Texas Crown Club products in that. And guess what else is in there? Texas Select is in the Texas Crown Club display in a bag, in clear violation of the injunction. So I didn't stipulate to its addition to this record, but now that they put it in, that's my take on it. And I think you can be guided that, if anything, those provisions in the injunction were absolutely- In a complaint bag? No words on the outside? It says Texas, it says Select Club, depending upon the jurisdiction, but it sits in a giant display that says Texas Crown. And Judge Hittner, in his discretion, enjoined the use of using Texas Crown or the other state crowns in association with bags. And that was within his discretion. And a good thing for my client that he did that. So in your view, the injunction, as it's currently worded, embraces what you just described to us is the display of these other products? The injunction provides that you cannot use Texas Crown on a bag, provision one. Provision two, you cannot sell crown products in connection with bags, which is what they're doing. And then the third thing is, he enjoined them from doing what many, many courts have done, is from doing other things that we can't think of just yet that are also likely to confuse consumers. For the latter that you just said, so I'm asking, are you saying that by placing the bandana bag, which doesn't have it laying there, but within a display, which does, I'm just saying, is it your position that the injunction, that latter part, covers that not previously unseen, but now seen provision? Hope that Judge Hittner doesn't hear me say this, but I'll be straight with him. I think the bandana issue is a closer question. I think that's a trickier one. I think putting select club products in bags directly underneath a giant Texas Crown display clearly violates the injunction. That's what I'm talking about. That's our position. Is it your position that, not the bottle, but the placement as you've described it, is it your position that the injunction as currently worded covers it? Right, that's all I'm asking. With respect to the use of bags under a Texas Crown display, the answer is yes. It is our position in the contempt motion that the bandana also violates it, but I'm conceding that that's a tougher question for us. All right, thank you, sir. Thank you, Your Honor. All right, back to you, Mr. Blackmon. Thank you, Your Honor. Your Honor, I would like to address briefly the de minimis argument that was raised by Mr. O'Rourke. The Lanham Act sections 42 and 43 are absolutely clear. Infringement occurs when a product is offered for sale or advertised for sale. It does not even have to be sold in order to constitute infringement. There is no quantity threshold in the Lanham Act for determining when infringement occurs, and when a litigant stands before a jury and the court and states as a judicial admission there was no infringement before the last quarter of 2011, they are speaking to the standards of the Lanham Act, section 42 and 43. It has nothing to do with quantity. De minimis quantity can go to the issue of whether or not there is a need for remedial action at that point, but it does not go to, it does not go to the issue of whether there's been infringement. And the concessions here, and I'd like to read the concessions because I think they refute the presentation that Mr. O'Rourke just gave. We asked the vice president of Diageo, do you believe that Diageo has an exclusive right to use of a velvet bag for alcoholic beverages? The answer was unequivocal, a single word, no. Have you ever registered any bag other than the iconic purple bag with gold stitching and gold drawstring that we've seen this morning? The answer again was no. Our client immediately abandoned the use of the gold cursive crown on all of the bags for all of the states except the one being Texas Crown Club, which was not gold cursive, and was admitted to be non-infringing. And as to that, we stopped using crown on a bag and went to a bandana around the bottle. So we feel that we complied with what had been stipulated by counsel and also required by the injunction completely in that regard. Let me go to the question that was posed about whether or not there was knowledge on the part of Diageo about the unlabeled bag being sold prior to fourth quarter of 2011. This is at tab 11 of our oral excerpts. The previous one, Your Honor, just for purposes of reference. The three-wing binder we got today? Yes, exactly. The first one, it was at tab seven. Now I'm turning to tab 11. Mr. O'Rourke says to the jury in closing argument, you have seen them sell it in crown, in bags, and my client didn't sue them. It is about crown on bags. That is all we want them to stop doing here. Stop using bags that say crown. So the suggestion that Diageo was not aware that we were selling this crown product in an unlabeled bag is inconsistent with the statement in the closing argument. Again, there was a statement during my opposing counsel's presentation that the trademarks were an issue. I asked the court to take a look again at tab 11 at the bottom. Mr. O'Rourke makes this judicial admission to the jury. Claims in this case are framed by the jury instructions and the verdict sheet, and the claim in this case is that their use of crown on bags infringes my client's trade dress. There is no claim for trademark infringement by the Texas bag-bottle in and of itself. There was simply, he goes on to say, that is pure fiction. There is nothing in the record on that. He was correct there. There was absolutely no submission by Diageo to the jury of any of their claims for trademark infringement on any of those word marks, and they pled each one of those word marks that we were using. I'm not talking, Mr. O'Rourke has confused two things, the design mark and the word marks. The designs we have absolutely abandoned. We're not using the gold cursive crown on any bag or on any label. However, the word marks should not be, are not infringing because of the reasons that I mentioned in my earlier presentation. If Texas Crown Club, as a word mark, extensively marketed prior to the fourth quarter of 2011 was admittedly non-infringing, the substitution of a state name should not make any other of those word marks infringing. Thank you, Your Honor. Thank you, Mr. Blackmon. Thank you, Mr. O'Rourke. Counsel to both sides. Interesting case, to put it mildly. We'll do our best to wade our way through and get it decided in due course. All right, appreciate it. All right, we call up.